UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AXIS INSURANCE COMPANY,

        Plaintiff,

      -v-                        7:15-CV-1131

ANTHONY WAYNE STEWART,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTHONY WAYNE STEWART,

        Counter-Claimant,

      -v-

AXIS INSURANCE COMPANY,

        Counter-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                      OF COUNSEL:

CARROLL, MCNULTY LAW FIRM        CHRISTOPHER R. CARROLL, ESQ.
Attorneys for Plaintiff/Counter-Defendant    KRISTIN V. GALLAGHER, ESQ.
120 Mountain View Blvd.             JOSEPH P. FUSCO, ESQ.
Basking Ridge, NJ 07920

WOODS OVIATT GILMAN LLP         BRIAN D. GWITT, ESQ.
Attorneys for Defendant/Counter-Claimant
1900 Main Place Tower
Buffalo, NY 14202

ICE MILLER LAW FIRM             ANGELA P. KRAHULIK, ESQ.
Attorneys for Defendant/Counter-Claimant   NICHOLAS B. REUHS, ESQ.
Box 82001
One American Square, Suite 2900
Indianapolis, IN 46282

DAVID N. HURD
United States District Judge

<u>**MEMORANDUM–DECISION and ORDER**</u>

## I. <u>INTRODUCTION</u>

This is an insurance coverage dispute between plaintiff/counter-defendant Axis Insurance Company ("Axis") and defendant/counter-claimant Anthony Wayne Stewart ("Stewart"). Axis seeks a judgment declaring that it is not obligated to defend or indemnify Stewart, a professional race car driver, in connection with a wrongful death lawsuit that has been brought against him by the estate of Kevin A. Ward, Jr. ("Ward"), a fellow driver who was killed when Stewart's car struck him during a race. Stewart contests Axis's refusal of coverage and has asserted counter-claims for breach of contract and bad faith.

The parties have both moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 seeking a summary determination of the coverage issue.[1] Both motions were fully briefed and oral argument was heard on June 6, 2016 in Utica, New York. Decision was reserved.

## II. <u>BACKGROUND</u>[2]

In October 2013, Tony Stewart Racing Enterprises ("TSRE"), through its insurance broker, submitted an application to Axis seeking commercial general liability, business auto, and umbrella coverage policies for its race team operations. On December 31, 2013, Axis responded to TSRE's insurance application with a "Proposal For Insurance," which was formally accepted by TSRE's representative the same day. As a result, Axis issued three

---

[1] Stewart's counterclaim for bad faith denial of coverage is directly implicated by these motions—if there was no coverage, there can be no bad faith in denying coverage.

[2] The following facts, which are undisputed unless otherwise noted, are drawn from the statements of material facts filed by the parties in accordance with Local Rule 7.1(a)(3), each side's respective responses to those statements, and the relevant declarations and attached exhibits.

policies to Stewart's race team, each effective between January 1, 2014 and January 1, 2015.  See Reuhs Aff. Ex. C (the "Policy").[3]

### A. The CGL Policy

The first of these was a primary commercial general liability policy issued under policy number AXGL01105050-14 (the "CGL Policy").  See Policy at 1-74.  As relevant here, "Coverage A" of this CGL Policy promised that Axis would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Id. at 26.

According to Axis, two important endorsements modified the CGL Policy.  The first of these, entitled "Schedule of Event(s)," listed 105 "Specified Event(s)"—65 World of Outlaws events, 30 USA Sprint events, and 10 USAC Silver Crown events.  Policy at 71.  This Schedule of Events endorsement warned that:

> Coverage provided by this policy applies only to the event(s) listed in the above Schedule, and only for the specific date(s) or said event(s).  In the event of complete and total postponement of any of the event(s) shown in the Schedule, from the specific event date(s), upon sufficient prior notification by you to us or our representative, such coverages as afforded by this policy, and for which premium has been received by us, shall be provided for said event(s) on a reassigned date, with no additional premium due.  All other terms and conditions remain unchanged.

Id. at 71 (emphases added).  The second endorsement, entitled "Participant Legal Liability – Motorsports" (the "PLL endorsement"), modified the CGL Policy in relevant part so that:

---

[3]  Pagination corresponds with that assigned by CM/ECF.

A.  The following is added to SECTION I - COVERAGES:

SECTION I - PARTICIPANT LEGAL LIABILITY COVERAGE

1.  Insuring Agreement

   We will pay for 'participant legal liability'.

Coverage includes those sums which you become legally obligated to pay because of actions brought against you for 'bodily injury' or 'property damage' by a 'participant' while practicing or participating in any motorsports contest or exhibition.

 . . . .

2.  Exclusion

This insurance does not apply to claims or actions brought by one racing vehicle driver against another racing vehicle driver.

. . . .

D.    The following definitions are added to SECTION V - DEFINITIONS:

1.  "Participant legal liability" means those sums that the insured becomes legally obligated to pay because of actions brought against the insured for 'bodily injury' or 'property' damage to a 'participant' while practicing for or participating in any event sponsored by you.

Id. at 68-69 (emphases added).

Stewart disputes the relevance of these two endorsements to the instant dispute and instead points to a different pair of endorsements found in the CGL Policy to support his position that coverage is warranted under the contract.  The first of these, entitled "Race Team," modified the CGL Policy by deleting Exclusion H(2), which ordinarily excluded coverage for bodily injury/property damage claims arising out of any "prearranged racing, speed, demolition, or stunting activity," from "Section I - Coverages."  Policy at 70.  The second, entitled "Limitation of Coverage to Designated Premises or Project" (the "Premises

- 4 -

or Project endorsement"), further modified the CGL Policy to include coverage for the "[i]nsured's motorsports team operations," which were defined to include "testing, tuning or on-track operations."  Id. at 51.

## B. The Excess Policy

Axis also issued a commercial excess liability policy to TSRE under policy number AXXS01102903-14.  Policy at 75-100; see also Reuhs Aff. Ex. F (the "Excess Policy").  The Excess Policy included, in relevant part, a "follow form" provision:

> The insurance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable "controlling underlying insurance", unless otherwise directed by this insurance.  To the extent such provisions differ or conflict, the provisions of this Coverage Part will apply.  However, the coverage provided under this Coverage Part will not be broader than that provided by the applicable "controlling underlying insurance".

Policy at 86.  In other words, the Excess Policy applied in excess of, and followed the terms and provisions of, the CGL Policy discussed above.

## C. The Ward Action

These policies were in effect the evening of August 9, 2014, when Stewart struck and killed Ward during an Empire Super Sprint ("ESS") Event being held at Canandaigua Motorsports Park in Canandaigua, New York.

According to the four-count complaint later filed by Ward's estate (the "Ward Action"), Ward, Stewart, and twenty-two other drivers were participating in the final race of this ESS Event when Stewart and Ward's race cars made contact, wrecking Ward's vehicle.  See Ward v. Stewart, 133 F. Supp. 3d 455, 459 (N.D.N.Y. 2015).  At or around this time, the race track came under a "yellow caution" flag, understood by the drivers as a signal that required

them to "slow down and move away" from the hazard on the track—in this case, Ward's wrecked vehicle.  Id.

While the remaining drivers, including Stewart, continued to race, Ward exited his now-disabled race car, walked down the track on foot, and was fatally injured when Stewart's car struck him.  Stewart, 133 F. Supp. 3d at 459.  The Ward Action alleges Stewart was negligent and/or reckless in striking Ward.  Id.  Stewart has denied the central allegations of the complaint as well as any liability for the incident.  See id.

### D.  Axis's Disclaimer of Coverage

On August 17, 2015, TSRE's insurance broker notified Axis of the Ward Action and requested that Axis provide Stewart with coverage under the terms of the Axis policies set forth above.  However, on September 18, 2015, Axis issued a letter to Stewart disclaiming coverage on the grounds that:  (1) the ESS event was not one of the "Specified Event(s)" listed in the CGL Policy's Schedule of Events endorsement; (2) the claims asserted in the Ward Action fell within the exclusion for claims "brought by one racing vehicle driver against another racing vehicle driver" contained in the PLL endorsement; (3) the vehicle Stewart was driving when he struck Ward was not a qualified "auto" under the Axis Auto Policy; and (4) coverage under the Axis Auto Policy was precluded under the "Racing" exclusion.[4]

It is against this backdrop that the parties have cross-moved for summary judgment.

---

[4]  The latter two bases on which Axis denied coverage relate to a third policy Axis issued to TSRE under policy number AXAL01101474-14.  This Auto Policy, which applies to certain categories of "Covered Autos," specifically excludes coverage for "[c]overed 'autos' while used in any professional or organized racing . . . activity."  See generally Policy at 101-54.  However, while Axis also seeks a favorable declaration regarding this policy, Stewart does not claim that it applies to the instant dispute and therefore further discussion is unnecessary.

## III. <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. <u>Anderson</u>, 477 U.S. at 250 n. 4. The failure to meet this burden warrants denial of the motion. <u>Id</u>. However, in the event this initial burden is met, the opposing party must then show, through affidavits or otherwise, that there is a material issue of fact for trial. <u>Id</u>. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. <u>Jeffreys</u>, 426 F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); <u>see also</u> <u>Anderson</u>, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV.  DISCUSSION

Since both parties have moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

### 1.  Choice of Law

As an initial matter, a choice-of-law issue must be addressed.  Since federal jurisdiction in this case is based on diversity of citizenship, the choice-of-law rules of the forum state are applied.  Wausau Bus. Ins. Co. v. Horizon Admin. Servs. LLC, 803 F. Supp. 2d 209, 214 (E.D.N.Y. 2011) ("As this Court's jurisdiction is based on diversity, New York's choice of law analysis applies.").

In New York, these choice-of-law rules typically require courts to determine "which jurisdiction has the greatest interest in the litigation using a 'center of gravity' or 'grouping of contacts' approach."  Wausau Bus. Ins. Co., 803 F. Supp. 2d at 214 (citing Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003)).

However, New York law also provides that "courts need not undertake a choice of law analysis unless there is a conflict between the applicable laws of the relevant jurisdictions, and in the absence of a conflict, a court may apply the substantive law of the forum."  Liberty Mut. Ins. Co. v. Fairbanks Co., –F. Supp. 3d–, 2016 WL 1169511, at *4 (S.D.N.Y. Mar. 22, 2016).

Stewart's initial moving papers omit any choice-of-law analysis and proceed on the assumption that New York law applies.  As for Axis, its submissions include a brief choice-of-law discussion that ultimately concludes that courts in Indiana and New York, the

two jurisdictions implicated here, "apply substantially the same approach as respects insurance policy interpretation" and therefore "there is no actual conflict as respects the central substantive legal issues in dispute."  Axis Opp'n at 12; Axis Reply at 5 n.3 (reiterating that "there is no actual conflict between Indiana and New York law as respects the legal issues" in this dispute).  Accordingly, New York law will be applied to resolve this case.  See, e.g., Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., –F. Supp. 3d–, 2015 WL 1914319, at *7 n.9 (S.D.N.Y. Apr. 28, 2015) (applying forum law where "neither party assert[ed] that there [was] a meaningful difference between the two jurisdictions' laws with respect to the instant dispute" and collecting cases approving of the same approach).

## 2. **Insurance Policy Interpretation**

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation."  In re Estates of Covert, 97 N.Y.2d 68, 75 (N.Y. 2001) (citations omitted).  "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  Porco v. Lexington Ins. Co., 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000)).

"Thus, the Court's analysis properly starts with the four corners of the Policy to determine if there is any ambiguity."  Porco, 679 F. Supp. 2d at 435; see also Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010) ("[T]he initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties."  (citations and internal quotation marks omitted)).

"When the provisions are unambiguous and understandable, courts are to enforce

them as written." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006).  "Policy terms are unambiguous where they provide 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" Liberty Mut. Ins. Co., 2016 WL 1169511 at *5 (quoting Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 99 (2d Cir. 2012)).

"Where, on the other hand, contract terms are 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business,' the contract terms are ambiguous and summary judgment is [generally] inappropriate." Liberty Mut. Ins. Co., 2016 WL 1169511 at *5 (quoting Olin Corp., 704 F.3d at 99).[5]

### 3.  Axis's Motion

Axis's primary argument is simple—the Schedule of Events endorsement, which on its face "modifies" the coverage provided under the CGL Policy, limited the bodily injury/property damage protection in Coverage A to "only" those claims arising from "the event(s) listed."  Policy at 71.  Because it is undisputed that the ESS Event where Stewart struck Ward was not one of the 105 events listed in this endorsement, the CGL Policy's bodily injury/property damage coverage is inapplicable to the Ward Action.

---

[5] "Where the court finds ambiguity in policy language, it need not empanel a jury to resolve that ambiguity if the matter can be resolved on the basis of the contract alone, without resorting to extrinsic evidence." U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc., 256 F. Supp. 2d 176, 181 (S.D.N.Y. 2003).  However, "[w]here there is a need for extrinsic evidence in order to ascertain the intent of the parties as to the meaning of the ambiguous term or terms, the matter is one for the jury and summary judgment is inappropriate." Id.

Not so, says Stewart.  According to him, the Schedule of Events endorsement "does not clearly indicate" that it applied to Coverage A's bodily injury/property damage protection, "leaving Stewart and TSRE to guess which coverages the endorsement does and does not apply to."  Stewart Reply at 9-10.  In support of this claim of ambiguity, Stewart contrasts the Schedule of Events endorsement with language in the Premises or Project endorsement, which explicitly limited the latter endorsement's applicability to the "bodily injury," "property damage," "personal and advertising injury," and "medical expenses" coverages found respectively at A, B, and C in the CGL Policy's "coverages" section.  Policy at 51.

Stewart argues the inclusion of this additional descriptive language in an endorsement is crucial and maintains that its omission from the Schedule of Events was significant.  In Stewart's opinion, applying what he refers to as the "event-specific" limitations of the Schedule of Events to all of the various forms of coverage found in the CGL Policy, such as the personal and advertising injury found in Coverage B, would render certain aspects of those coverages "illusory."  Stewart Reply at 8.  Instead, Stewart asserts that this "event-specific" endorsement is properly understood only as a limitation on the scope of a completely separate form of event-specific coverage that Stewart argues is memorialized in the PLL endorsement.  See id.

Stewart insists this two-step construction is a far better reading of the CGL Policy, since Coverage A actually "contemplates non-event-specific coverages (e.g., off-track tuning, premises liability, etc.)."  Stewart Reply at 9.  In his estimation, the only reasonable explanation for the inclusion of an event-specific endorsement like the Schedule of Events would be to modify some sort of event-specific coverage, such as the special form of coverage allegedly set forth in the PLL endorsement.  Since the bodily injury/property

damage protection afforded by Coverage A is *not* actually confined to the 105 listed events in the Schedule of Events endorsement, the Ward Action is in fact covered by the CGL Policy.

Axis replies that the mere fact the Schedule of Events endorsement does not exactly mirror certain language Stewart has plucked out of the Premises or Project endorsement does not mean that it cannot be just as easily harmonized with the various coverages explicitly listed in the CGL Policy.  Axis also points to a "driver to driver" exclusion in the PLL endorsement to argue that its application to this case is an additional basis on which to completely bar Stewart's request for coverage.  See Policy at 68 ("This insurance does not apply to claims or actions brought by one racing vehicle driver against another racing vehicle driver.").

### a. PLL Endorsement

There is nothing ambiguous about how the PLL endorsement should be read as part of the CGL Policy.  The endorsement clearly states that it "modifies insurance provided under" the "Section I - Coverages" portion of the CGL Policy.  See Policy at 68-69.  This "coverages" section of the Policy is structured as follows:

    -SECTION I - COVERAGES

        -COVERAGE A - BODILY INJURY AND PROPERTY
          DAMAGE LIABILITY
          1. Insuring Agreement
          2. Exclusions

        -COVERAGE B - PERSONAL AND ADVERTISING
          INJURY LIABILITY
          1. Insuring Agreement
          2. Exclusions

        -COVERAGE C - MEDICAL PAYMENTS
          1. Insuring Agreement
          2. Exclusions

<u>See</u> Policy at 26-33.

As the text set forth above makes plain, each form of "coverage" delineated under the "Section I - Coverages" heading follows a common structure, with each coverage subheading first containing an "insuring agreement," which makes a general statement explaining what sort of coverage that subsection provides, followed by an "exclusions" section, which explains the particular exclusions applicable to that subheading's "insuring agreement."  Policy at 68.

"It is settled that in construing an endorsement to an insurance policy, the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the words of the endorsement."  <u>Cnty. of Columbia v. Cont'l Ins. Co.</u>, 612 N.Y.2d 618, 628 (N.Y. 1994).

When the PLL endorsement is read together as part of this "coverages" section, the resulting structure is as follows:

> -SECTION I - COVERAGES
>
>> -COVERAGE A - BODILY INJURY AND PROPERTY
>> DAMAGE LIABILITY
>>> 1. Insuring Agreement
>>> 2. Exclusions
>
>> -COVERAGE B - PERSONAL AND ADVERTISING
>> INJURY LIABILITY
>>> 1. Insuring Agreement
>>> 2. Exclusions
>
>> -COVERAGE C - MEDICAL PAYMENTS
>>> 1. Insuring Agreement
>>> 2. Exclusions
>
>> . . . .

-SECTION I - PARTICIPANT LEGAL LIABILITY
COVERAGE
1. Insuring Agreement
2. Exclusion

Policy at 26-33, 68-69.

The language and structure of the PLL endorsement precisely track the pattern established in this "coverages" section, first adding an "insuring agreement" followed by an applicable "exclusion" section.  Accordingly, this document modifies the contract by adding supplemental coverage.  Response Personnel Inc. v. Hartford Fire Ins. Co., 812 F. Supp. 2d 309, 315 (S.D.N.Y. 2011) ("The Endorsement modifies the Policy by adding a supplemental 'Insuring Agreement[.]'").

To be sure, the repetition of the "Section I" language at the very beginning of this newly added subheading is unnecessary, but read in context this minor drafting irregularity does nothing to render the PLL endorsement ambiguous in light of its consistent text and structure.  Importantly, the ambiguity inquiry is concerned with clarity and precision, not perfection, and it is clear here that the PLL endorsement uses definite language to add to the coverage available under "Section I - Coverages" of the CGL Policy.  See, e.g., Am Int'l Specialty Lines Ins. Co. v. Nat'l Ass'n of Bus. Owners & Prof'ls, 324 F. Supp. 2d 353, 359 (E.D.N.Y. 2004) (concluding endorsement's language was unambiguous despite minor grammatical errors).

## b. Driver to Driver Exclusion

Given this unambiguous construction, Stewart is correct to argue that the PLL endorsement's "driver to driver exclusion" does not apply to bar his coverage claim.  In New York, "an insurer bears the burden of proving that an exclusion applies."  Ment Bros. Iron

Works Co., Inc. v. Interstate Fire & Cas. Co., 702 F.3d 118, 121 (2d Cir. 2012). Therefore, to "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." Parks Real Estate Purchasing Grp., 472 F.3d at 42 (quoting Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y., 671 N.Y.S.2d 66, 69 (N.Y. App. Div. 1st Dep't 1998)).

The "insuring agreement" in the PLL endorsement subheading first promises that Axis will pay for "participant legal liability," which is in turn defined by the endorsement itself as "those sums that the insured becomes legally obligated to pay because of actions brought against the insured for 'bodily injury' or 'property damage' to a participant while practicing for or participating in any event sponsored by you." Policy at 68-69 (emphasis added). The "exclusion" section of this endorsement then warns that the coverage otherwise provided in this insuring agreement "does not apply to claims or actions brought by one racing vehicle driver against another racing vehicle driver." Id. at 68.

In other words, the coverage provided by the PLL endorsement obligates Axis to reimburse its insured for payments made in connection with bodily injury/property damage claims arising from events "sponsored by" the insured, unless those payments are the result of "claims or actions" between racing vehicle drivers. Since the parties agree that neither Stewart nor TSRE sponsored the ESS Event at issue, this exclusion to the PLL endorsement's insuring agreement does not apply to bar Stewart's claim. Cf. U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L., 823 F.3d 146, 151 (2d Cir. 2016) (concluding portion of policy limiting coverage to claims arising from "your advertising" was inapplicable to coverage

dispute where "there was no advertising by [the insured] here").[6]  Accordingly, Axis's exclusion argument will be rejected.

### c.  <u>Schedule of Events Endorsement</u>

The determination of the PLL endorsement does not end the matter, since the Schedule of Events endorsement is still the subject of a vigorous debate.  As he explained at oral argument, Stewart believes the inclusion of the PLL endorsement in the CGL Policy in the first place is actually just the result of underwriting confusion.  According to him, the PLL endorsement's "sponsored by you" language is the sort of coverage that should only ever be sold to race *sponsors*, such as sanctioning bodies, race tracks, and event organizers, not racing *participants*, such as TSRE.

Thus, in Stewart's opinion, the Schedule of Events, as an "event-specific" endorsement, is only properly associated with, and more importantly only relevant to, the "event-specific" sponsorship coverage set forth in the allegedly mistakenly included PLL endorsement just discussed:

> [T]he 'Schedule of Event(s)' fits hand-and-glove with the PLL coverage section.  This also explains why the 'Schedule of Event(s)' endorsement did not identify the coverage parts to which it applies (as Axis's other endorsement did) - it requires no coverage section identification because it was simply meant to identify the 'covered programs' reference in the PLL endorsement.

Stewart Reply at 11.

It is unnecessary to resort to extrinsic evidence or to apply the doctrine of contra proferentem to resolve the remaining question presented by this case.  <u>See, e.g.</u>, <u>Catlin</u>

---

[6]  In any event, Stewart explicitly disclaims coverage under the PLL endorsement.  <u>See</u> Stewart Reply at 3 ("Stewart is <u>not</u> relying upon the [PLL] coverage endorsement to establish coverage."  (emphasis in original)).

Speciality Ins. Co. v. QA3 Fin. Corp., 36 F. Supp. 3d 336, 341 (S.D.N.Y. 2014) (discussing avenues of analysis in cases of ambiguous contract language).

        The mere fact that an insured's policy contemplates coverage for a situation in which the insured now insists it will never find itself (such as "sponsoring" a race event) is simply not a sufficient basis on which to conclude a policy, or one or more of its provisions, is somehow necessarily ambiguous.  Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (N.Y. 2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing.").

        As discussed at length above, a commonsense reading of the PLL endorsement provides unambiguous answers to any claimed uncertainty about how it fits into the CGL Policy, what it covers, and what it excludes.  Because this endorsement speaks in clear language, there is simply no need to delve into the parties' underlying (or even allegedly mistaken) intent in including it in the CGL Policy in the first place.  Greenfield, 98 N.Y.2d at 569 ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

        The application of the Schedule of Events endorsement is also clear when the CGL Policy is considered as a whole.  "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement, and where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity."  Law Debenture Tr. Co. of N.Y., 595 F.3d at 467 (citations and internal quotation marks omitted).

        The "insuring agreement" in the Coverage A subheading of the now-familiar "Section I - Coverages" of the CGL Policy promises that Axis "[w]ill pay those sums that the

insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Policy at 26.

Of course, like all the other coverages found in this "coverages" section, Coverage A enumerates a number of "exclusions" to the coverage set forth in that subheading's "insuring agreement."  Policy at 27-31.  Notably, Exclusion H(2) in Coverage A explicitly excludes bodily injury/property damage protection for injuries arising out of "any prearranged racing, speed, demolition, or stunting activity."  Id. at 29.

However, in recognition of the fact that TRSE is a race team, the CGL Policy issued to Stewart included an additional form endorsement entitled "Race Team."  Policy at 70.  True to its name, this endorsement tacitly permits that class of activities by deleting the portion of Exclusion H that would have otherwise specifically eliminated any bodily injury/property damage coverage for claims arising from them.  See id.

But this Race Team endorsement makes no affirmative statements about what, if any, racing activities *will* be explicitly covered by the CGL Policy.  Rather, the answer to that question is found in the Premises or Project endorsement, which explains in relevant part that bodily injury/property damage is in fact specifically covered by the CGL Policy for the "testing, tuning or on-track operations" conducted as part of the "[i]nsured's motorsports team operations."  Policy at 51.

The Policy's language could well have stopped there, which would have meant broad coverage for bodily injury/property damage arising from *any* "testing, tuning or on-track operations" conducted in connection with *any* of the insured's "motorsports team operations" during the effective term of the policy.  And if that were the case, it would be completely unreasonable for Axis to claim that the bodily injuries arising from Stewart's on-track actions

- 18 -

at the ESS event were not covered by the CGL Policy.

But the Policy's language does not stop there.  Instead, an additional endorsement further modified the CGL Policy—the Schedule of Events, which listed the activities in which the insured would be covered under the CGL Policy in connection with the "motorsports team operations" permitted by the Race Team endorsement and defined by the Premises or Project endorsement.[7]

This rather seamless integration of the Schedule of Events into the CGL Policy is further supported by the fact that the Policy actually includes other "event-specific" language.  There is the endorsement's own text, which explicitly states that it "modifies" the insurance provided under the CGL Policy and that it limits coverage to the listed events.  See Policy at 71.  In addition, a "Policy Changes" endorsement found elsewhere notes that, "in the event of a termination of this policy during any policy year for any reason, the premium earned for the period the policy was in effect shall be determined by the number of racing events that were competed in during the policy period."  Id. at 74 (emphasis added).  Likewise, an "Aggregate Limit Per Event" endorsement indicates that the general aggregate limit "applies separately to each of your events."  Id. at 66 (emphasis added).

In light of these various "event-specific" statements, Stewart's claim that the Schedule of Events was somehow unique in nature and thus only properly connected to the coverage provided by the allegedly mistakenly included PLL endorsement is without merit.  Similarly meritless is the relevance of Stewart's eleventh-hour assertion that "the number of events

---

[7]  Unlike the "driver to driver" exclusion in the PLL endorsement, the Schedule of Events was a "classification limitation," a document which "define[d] the activities that were included within the scope of coverage in the first instance[.]"  Black Bull Contracting, LLC v. Indian Harbor Ins. Co., 23 N.Y.S.3d 59, 62 (N.Y. App. Div. 1st Dep't 2016) (citation and internal quotation marks omitted).

included in the 'Schedule of Event(s)' did not even match the total number of events for each [racing] series." Stewart Reply at 13. Even assuming this claim to be true, it would not compel a finding of ambiguity.

"[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy." Mostow v. State Farm Ins. Cos., 645 N.Y.S.2d 421, 423 (N.Y. 1996); see also Wai Kun Lee v. Otsego Mut. Fire Ins. Co., 854 N.Y.S.2d 211, 212 (N.Y. App. Div. 2d Dep't 2008) ("When construing an insurance contract, the tests to be applied are common speech and the reasonable expectation and purpose of the ordinary businessman.").

In addition to all the language set forth above, the "Commercial General Liability Coverage Schedule" found in the CGL Policy further indicates that the total premium charged to TRSE was based on an "exposure" to 105 "racing events." Policy at 24-25; see also Gallagher Aff. Ex 11.[8] The CGL Policy itself also warned Stewart in no uncertain terms that information contained within the Policy was based on the accuracy of representations that had been made to Axis. See Policy at 37-38.

It is clear that the average insured, upon reading the CGL Policy in this case, would have expected and understood that exposure to, and thus Axis's possible responsibility for, insurance claims arising from team racing activities would be limited to the listed events. In fact, the average insured would have understood this same limitation to apply with equal

---

[8] As another court has observed, "[i]t is [therefore] evident from the declarations page that the specific classifications were the basis on which the premium was calculated." Black Bull Construction, LLC, 23 N.Y.S.3d at 60.

force to any events it might have been planning to "sponsor" during the policy term.[9]

There might be some basis on which to doubt this interpretation if, for instance, the Schedule of Events contained some manner of limiting language to suggest it did not naturally modify the coverages explicitly listed in the CGL Policy.  But absent such an indication, it is easy to conclude that bodily injury/property damage is among the class of risks expected to naturally flow from the insured's covered activities.  Cf. U.S. Underwriters Ins. Co., 256 F. Supp. 2d at 181 ("When construing the terms of an insurance contract, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

Stewart attempts to avoid this obvious, logical construction of the CGL Policy by arguing that the "Premises or Project" endorsement simply cannot be squared with the Schedule of Events, since the former implies extremely broad coverage in connection with, say, any sort of motorsports operations and therefore could arguably be read to include claims that occur outside the confines of one of the latter's 105 Specified Events.

However, the mere fact that an insured can proffer a construction of a contract that renders its provisions partially contradictory does not make such a construction "reasonable."  Law Debenture Tr. Co. of N.Y., 595 F.3d at 467 ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would strain [ ] the contract language beyond its reasonable and ordinary meaning.").

Simply put, Axis's interpretation of the Schedule of Events endorsement as a limitation on the events that would be covered under the CGL Policy is a commonsense reading of the

---

[9]  As noted above, the fact an insured elected not to make use of a certain form of coverage in a policy does not mean the inclusion of that coverage renders the policy ambiguous.

document when it is considered in the context of the whole Policy.  The chain of inferences and series of second-guesses necessary to reach an alternative conclusion—that the Schedule of Events was a mistaken addition to the CGL Policy and that its application was limited to the sponsorship coverage found in the PLL endorsement—is a painfully strained reading of the CGL Policy's provisions.  Accordingly, Axis's motion for summary judgment will be granted.

**V.  <u>CONCLUSION</u>**

The CGL Policy is unambiguously limited by the Schedule of Events endorsement, which does not include the ESS Event where Stewart struck Ward.  Therefore, Axis is not obligated to provide a defense or indemnification to Stewart in connection with the Ward Action.  Because Axis's cross-motion for summary judgment will be granted, Stewart's motion will be denied.

Therefore, it is

ORDERED that

1.  Plaintiff/counter-defendant Axis Insurance Company's cross-motion for summary judgment is GRANTED;

2.  Defendant/counter-claimant Anthony Wayne Stewart's motion for partial summary judgment is DENIED;

3.  Plaintiff/counter-defendant Axis Insurance Company is not obligated to defend or indemnify defendant/counter-claimant Anthony Wayne Stewart in the lawsuit brought against him by the estate of Kevin A. Ward, Jr. in the Northern District of New York (7:15-CV-1023); and

4.  Defendant/counter-claimant Anthony Wayne Stewart's counter-claims are

DISMISSED.

The Clerk of the Court is directed to enter judgment and close the file.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  July 29, 2016
        Utica, New York.